ANDREW R. MUEHLBAUER, ESQ.
Nevada Bar No. 10161
**MUEHLBAUER LAW OFFICE, LTD.**
7915 West Sahara Avenue, Suite 104
Las Vegas, Nevada 89117
Telephone: 702.330.4505
Facsimile: 702.825.0141
Email: andrew@mlolegal.com

**POMERANTZ LLP**
Jeremy A. Lieberman (admitted *pro hac vice*)
Murielle J. Steven Walsh (pending *pro hac vice*)
Aatif Iqbal (pending *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Tel:      (212) 661-1100
Fax:      (917) 463-1044
Email: jalieberman@pomlaw.com
          mjsteven@pomlaw.com
          aiqbal@pomlaw.com

*Attorneys for Lead Plaintiff Phoenix Insurance Company Ltd.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| MAC COSTAS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ORMAT TECHNOLOGIES, INC., ISAAC ANGEL, and DORON BLACHAR,<br><br>Defendants. | Case No.: 3:18-cv-00271-RCJ-WGC<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Preliminary Statement ......................................................................................... 1

Jurisdiction and Venue ........................................................................................ 1

Parties ................................................................................................................... 2

    Plaintiff ........................................................................................................... 2

    Defendants ...................................................................................................... 2

        Individual Defendants ............................................................................. 2

Factual Background .............................................................................................. 4

    Relevant Accounting Standards ...................................................................... 5

        GAAP Requirements for Deferred Tax Assets and Liabilities ............... 6

        U.S. Taxation of Income of Foreign Subsidiaries ................................. 8

        GAAP Requirements for the Correction of Errors in Previously-Issued Financial Statements ........................................................................................... 10

        Internal Controls .................................................................................. 11

    2015: The Company's New Strategic Plan .................................................... 13

        The Viridity Acquisition ....................................................................... 14

        ONGP Portfolio PPA Agreement ......................................................... 16

The Class Period ................................................................................................ 17

    The 2017 2Q 10-Q ....................................................................................... 18

    The 2017 3Q 10-Q ....................................................................................... 24

The Truth Begins to Emerge ............................................................................. 27

    The 2017 10-K ............................................................................................. 27

    The Restatement ........................................................................................... 31

Loss Causation ................................................................................................... 41

Class Action Allegations .................................................................................... 41

Count I ................................................................................................................ 43

Count II .............................................................................................................. 46

Count III ............................................................................................................. 47

Prayer for Relief ................................................................................................ 51

Jury Demand ...................................................................................................... 51

i

Lead Plaintiff Phoenix Insurance Company Ltd. ("Phoenix"), on behalf of itself and all others similarly situated, allege the following based upon personal knowledge as to its own acts and upon information and belief as to all other matters based on the investigation conducted by Lead Counsel, which included a review of, inter alia, SEC filings by Ormat Technologies, Inc. ("Ormat" or the "Company"), press releases and other public statements by Defendants, conference calls and announcements made by Defendants, media and analyst reports and advisories about the Company, regulatory filings, and other public information. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **Preliminary Statement**

1.      This is a federal securities class action, against the Company and certain of its directors and executive officers, on behalf of all persons who purchased or otherwise acquired the Company's securities between August 8, 2017 and May 15, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      As a result of Defendants' false and misleading and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## **Jurisdiction and Venue**

3.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

4.      This Court has subject matter jurisdiction under 28 U.S.C. §1331 and Section 27 of the Exchange Act. The Court also has supplemental jurisdiction over claims arising under Israeli Law under 28 U.S.C. §§ 1367.

5.      Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company is headquartered in this District and a significant portion of Defendants' actions took place in this District.

6.      In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

# Parties

## Plaintiff

7.      **Lead Plaintiff Phoenix Insurance Company Ltd.** ("Phoenix") acquired the Company's securities at artificially inflated prices, on both the New York Stock Exchange ("NYSE") and the Tel Aviv Stock Exchange ("TASE"), during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

## Defendants

8.      **Defendant Ormat Technologies, Inc.** ("Ormat" or the "Company") is a Delaware corporation with principal executive offices located at 6140 Plumas Street, Reno, Nevada 89519-6075. Its securities trade under the ticker symbol "ORA" on both the NYSE and TASE. Its equipment manufacturing operations are located in Yavne, Israel, and operated through its wholly owned Israeli subsidiary, Ormat Systems Ltd. ("Ormat Systems" or "OSL").

### *Individual Defendants*

9.      **Defendant Isaac Angel** began serving as an officer of the Company in April 2014 and has served as CEO since July 2014. Mr. Angel served as a director of Retalix Ltd. from 2012 until 2013 and as a director of Frutarom Ltd. from 2008 until 2016. From 2008 to 2009, Mr. Angel served as Executive Chairman of LeadCom Integrated Solutions Ltd. From 2006 to 2008, Mr. Angel served as Executive Vice President, Global Operations of VeriFone

after the acquisition of Lipman Electronic Engineering Ltd. by VeriFone. From 1999 to 2006, he served in various positions at Lipman, including as its President and CEO.

10.     **Defendant Doron Blachar** has served as CFO since April 2013. From 2011 to 2013, Mr. Blachar served as a director of A.D.O. Group Ltd., a TASE-listed company. From 2009 to 2013, Mr. Blachar was the CFO of Shikun & Binui Ltd. From 2005 to 2009, Mr. Blachar served as Vice President—Finance of Teva Pharmaceutical Industries Ltd. From 1998 to 2005, Mr. Blachar served in a number of positions at Amdocs Limited, including as Vice President—Finance from 2002 to 2005. Mr. Blachar earned a BA in Accounting and Economics and an MBA from Tel Aviv University. He is also a Certified Public Accountant in Israel.

11.     The following table summarizes the Individual Defendants' executive compensation, according to the Company's April 2019 Definitive Proxy Statement:

| Name | Total Compensation Received | | |
| --- | --- | --- | --- |
| | **2016** | **2017** | **2018** |
| CEO Isaac Angel | $2,486,082 | $1,356,435 | $7,984,551 |
| CFO Doron Blachar | $1,151,147 | $2,457,197 | $573,772 |

12.     The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public (as further detailed herein), the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

# Factual Background

13.     Ormat is engaged in the geothermal and recovered energy power businesses. With operations in 30 countries around the globe, Ormat describes itself as the leading vertically-integrated energy company, and its stated objective is to become the world's leading provider of renewable energy.

14.     Ormat conducts its business activities in three business segments. As described in its 2018 10-K:

> ● *Electricity Segment*. In the Electricity segment we develop, build, own and operate geothermal and recovered energy-based power plants in the U.S. and geothermal power plants in other countries around the world and sell the electricity they generate.

> ● *Product Segment*. In the Product segment we design, manufacture and sell equipment for geothermal and recovered energy-based electricity generation and remote power units and provide services relating to the engineering, procurement, construction, operation and maintenance of geothermal, Solar PV and recovered energy-based power plants.

> ● *Other Segment*. In the Other segment, we provide energy storage, demand response and energy management related services as well as services relating to the engineering, procurement, construction, operation and maintenance of energy storage units mainly through our Viridity business.

15.     The following table sets forth the breakdown of annual revenues attributable to the Company's three segments since 2014:

|  |  | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|
|  |  | (in thousands) | | | | |
| **Revenues** |  | $559,524 | $594,644 | $662,591 | $692,812 | $719,267 |
|  | **Electricity** | $382,301 | $375,920 | $436,292 | $465,593 | $509,879 |
|  | **Product** | $177,223 | $218,724 | $226,299 | $224,483 | $201,743 |
|  | **Other** | -- | -- | -- | $2,736 | $7,645 |

**Relevant Accounting Standards**

16.     The fraud alleged herein arises, in part, from Defendants' admitted violations of Generally Accepted Accounting Principles ("GAAP"). Throughout the Class Period, Defendants stated that the Company's financial statements were "prepared in accordance with" GAAP.

17.     GAAP is the authoritative accounting standards for the financial reporting of public companies in the United States. The SEC requires that public companies present financial statements in accordance with GAAP. "Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures." 17 C.F.R. § 210.4-01(a)(1).

18.     GAAP has been codified by the Financial Accounting Standards Board ("FASB") in its Accounting Standards Codification ("ASC"). The FASB has also issued guidance in the form of Statements of Financial Accounting Concepts ("FASCON"s), which set forth the conceptual framework underlying GAAP, as well as its objectives, qualitative characteristics, and other concepts used in the development of GAAP.

19.     As the FASB has explained, the "objective of general-purpose financial reporting is to ***provide financial information about the reporting entity that is*** useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity."[1]

20.     The accounting violations at issue concern the accounting for deferred tax assets and liabilities, income generated by foreign subsidiaries, and the relationship between federal income tax and tax on foreign earnings. Beyond the impacts to net income for accounting for such items properly, for a capital-intensive business with operations in numerous countries like Ormat, these issues have a significant impact on the Company's balance sheet, and therefore,

---

[1] FASB, FASCON No. 8, *Conceptual Framework for Financial Reporting - Chapter 1, The Objective of General Purpose Financial Reporting, and Chapter 3, Qualitative Characteristics of Useful Financial Information* OB2 (Sep. 2010), available at https://www.fasb.org/jsp/FASB/Document_C/DocumentPage?cid=1176157498129 .

are key to gaining an accurate valuation of the Company.

### *GAAP Requirements for Deferred Tax Assets and Liabilities*

21.     Under GAAP, a company may record a liability, or "provision," in its financial statements for future income taxes owed. This requires estimating the amount that the company expects to owe to each jurisdiction for the current year. When a company records such a provision, its reported net income is directly impacted.

22.     When estimating a company's provision for income taxes, it is particularly important to properly account for "deferred" tax assets and/or liabilities. A "deferred tax asset" is an asset on a company's balance sheet that may be used to reduce its taxable income in the future. Conversely, a "deferred tax liability" is a liability on a company's balance sheet which may increase the amount of income tax owed by a company in the future. (*See* FASB ASC 740, *Income Taxes* ("ASC 740"), section 10, ("ASC 740-10," *Glossary*)).

23.     Deferred tax assets can come in a variety of forms. The simplest example of a deferred tax asset is a net-operating-loss carry-forward (a "NOL"). If a business incurs a loss in one year, it usually is entitled to use that loss in order to offset its taxable income in future years, until such carry-forwards expire.

24.     The principal purpose of deferred tax assets is to offset future tax obligations emanating from an entity generating taxable income. Accordingly, a company's ability to utilize deferred tax assets is constrained by the amount of its reportable income, and the carrying value of a deferred tax asset is directly correlated to whether the company expects to be able to use it before it expires (based on its expectation of future earnings). For example, a company may have insufficient income to fully utilize its NOLs, or its tax credits may expire prior to full utilization.

25.     In such cases, where a company determines that it may not be able to utilize the full benefits of its deferred tax assets it is required to reduce or eliminate the net carrying value of the reported assets by an "allowance." ASC 740-10 provides that: "[a] deferred tax asset is reduced by a valuation allowance if, based on the weight of evidence available, it is more likely

than not that some portion or all of a deferred tax asset will not be realized." ASC 740-10, *Glossary*.

26.     Deferred tax assets or liabilities can also arise due to differences between accounting rules and tax rules, such as when expenses are recognized in the income statement before they are required to be recognized by the tax authorities or when revenue is subject to taxes before it is taxable in the income statement. In this context, a "temporary difference" is the difference between the carrying amount of an asset or liability in the balance sheet and its tax base. A "deductible temporary difference" is a temporary difference that will yield amounts that can be deducted in the future when determining taxable profit or loss, and is a deferred tax asset. A "taxable temporary difference" is a temporary difference that will yield taxable amounts in the future when determining taxable profit or loss, and is a deferred tax liability.

27.     In furtherance of its foundational principle of clarity in financial statements, GAAP prohibits companies from "offset[ing] deferred tax liabilities and assets attributable to… different tax jurisdictions." ASC 740-10-45-6. For example, a multinational corporation may not offset its Italian deferred tax liability with a U.S. deferred tax asset attributable to tax credits when reporting net deferred tax benefits in its financial statements or for purposes of determining its income tax provision (and therefore net income) under GAAP.

28.     Ormat addressed this topic as follows in its 2016 10-K:

> *Accounting for Income Taxes*. Significant estimates are required to arrive at our consolidated income tax provision and other tax balances. This process requires us to estimate our actual current tax exposure and to make an assessment of temporary differences resulting from differing treatments of items for tax and accounting purposes. Such differences result in deferred tax assets and liabilities which are included in our consolidated balance sheets. For those jurisdictions where the projected operating results indicate that realization of our net deferred tax assets is not more likely than not, a valuation allowance is recorded.
>
> **We evaluate our ability to utilize the deferred tax assets quarterly and assess the need for the valuation allowance.** In assessing the need for a valuation allowance, we estimate future taxable income, considering the feasibility of ongoing tax planning strategies and the

7

realization of tax loss carryforwards. Valuation allowances related to deferred tax assets can be affected by changes in tax laws, statutory tax rates, and future taxable income. We have recorded a valuation allowance related to our U.S. deferred tax assets. In the future, if there is sufficient evidence that we will be able to generate sufficient future taxable income in the U.S., we may be required to reduce this valuation allowance, resulting in income tax benefits in our consolidated statement of operations.

### *U.S. Taxation of Income of Foreign Subsidiaries*

29.     The United States imposes a worldwide system of taxation, under which all of a U.S. incorporated company's income—including the foreign earnings of any controlled non-U.S. subsidiaries—is subject to taxation by the U.S. government.

30.     However, the earnings of a foreign subsidiary of a U.S. corporation are taxed not when earned, but when they are "repatriated" into the United States. In the meantime, the company is required to record a deferred tax liability on its undistributed foreign earnings.

31.     Specifically, ASC 740 provides:

> **25-2** Including undistributed earnings of a [foreign] subsidiary (which would include the undistributed earnings of a domestic international sales corporation eligible for tax deferral) in the pretax accounting income of a parent entity either through consolidation or accounting for the investment by the equity method results in a temporary difference.

> **25-3** It shall be presumed that all undistributed earnings of a [foreign] subsidiary will be transferred to the parent entity. Accordingly, the *undistributed earnings of a subsidiary included in consolidated income shall be accounted for as a temporary difference* unless the tax law provides a means by which the investment in a domestic subsidiary can be recovered tax free.

32.     However, this is one major exception to this requirement: the "permanent reinvestment assertion." If a company asserts that its foreign subsidiary investments will be permanently reinvested abroad—i.e. that the foreign earnings *will not be repatriated* to the U.S.—then those undistributed foreign earnings are exempt from U.S. taxation.

8

33.     To avail itself of the permanent reinvestment assertion, a company must meet the "sufficient evidence" requirements of ASC 740:

> The presumption in paragraph **740-30-25-3** that all undistributed earnings will be transferred to the parent entity may be overcome, and no income taxes shall be accrued by the parent entity, for entities and periods identified in the following paragraph if ***sufficient evidence shows that the subsidiary has invested or will invest the undistributed earnings indefinitely or that the earnings will be remitted in a tax-free liquidation***. A parent entity shall have ***evidence of specific plans for reinvestment of undistributed earnings of a subsidiary which demonstrate that remittance of the earnings will be postponed indefinitely***. These criteria required to overcome the presumption are sometimes referred to as the indefinite reversal criteria. Experience of the entities and definite future programs of operations and remittances are examples of the types of evidence required to substantiate the parent entity's representation of indefinite postponement of remittances from a subsidiary.

34.     If a company satisfies these requirements, then it does not need to record any deferred tax liability for any such undistributed foreign earnings.

35.     However, if a company changes its plans and determines that it will ***not*** reinvest its undistributed foreign earnings back into the same entity—then those undistributed foreign earnings become subject to U.S. taxation, and the company must therefore record a deferred tax liability for any such undistributed foreign earnings (until they are repatriated and the associated taxes paid). That is to say, once a company can no longer, or is no longer willing to, make an assertion that it will permanently reinvest earnings generated by a foreign subsidiary back into that same foreign subsidiary, those earnings must be repatriated to the United States and are subject to U.S. Federal income tax.

36.     Ormat addressed this topic as follows in its 2016 10-K:

> The total amount of undistributed earnings of foreign subsidiaries for income tax purposes was approximately $367 million at December 31, 2016. It is the Company's intention to reinvest undistributed earnings of its foreign subsidiaries and thereby indefinitely postpone their remittance. Accordingly, no provision has been made for foreign

withholding taxes or U.S. income taxes which may become payable if undistributed earnings of foreign subsidiaries were paid as dividends to the Company. The additional taxes on that portion of undistributed earnings which is available for dividends are not practicably determinable.

The Company believes that based on our plans to increase the operations outside of the U.S., the cash generated from our operations outside of the U.S. will be reinvested outside of the U.S. and, accordingly, we do not currently plan to repatriate the funds we have designated as being permanently invested outside the U.S. If we change our plans, we may be required to accrue and pay U.S. taxes to repatriate these funds.

### GAAP Requirements for the Correction of Errors in Previously-Issued Financial Statements

37.     Under GAAP, a company is required to restate its previously-issued financial statements if/when it determines that such financial statements contained material errors. ASC 250, *Accounting Changes and Error Corrections* ("ASC 250"), provides guidance on the accounting for and reporting of corrections of errors in previously-issued financial statements. (ASC 250). ASC 250 provides that "any error in the financial statements of a prior period discovered after the financial statements are issued or are available to be issued should be reported as an error correction, by restating the prior-period financial statements."[2] (ASC 250-10-45-23).

38.     According to 250-10-45-23, restated financial statements require all of the following to be presented:

The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.

An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.

---

[2] The term "period" refers to both annual and interim reporting periods. (ASC 250-10-45-23).

Financial statements for each individual prior period presented shall
be adjusted to reflect correction of the period-specific effects of the
error.

39.     The restatement of prior period financial statements is an acknowledgement by
an entity that those financial statements did not comply with GAAP, as well as that those prior
period financial statements were being relied upon by investors and that the errors present
therein were material to investors, otherwise a restatement would not be necessary.

40.     As detailed below, Ormat was eventually forced to "restate its second, third and
fourth quarter 2017 financial statements and its full-year 2017 financial statements" due to
"errors in the income tax provision primarily relating to the Company's valuation allowance
based on the Company's ability to utilize foreign tax credits in the U.S. prior to their expiration"
and the improper netting of "certain deferred income tax assets and deferred income tax
liabilities across different tax jurisdictions that are not permitted to be netted pursuant to United
States generally accepted accounting principles"—which restatement impacted "income tax
(provision) benefit line item in the Company's statements of operations, with associated impacts
to net income and earnings per share."

### Internal Controls

41.     The Securities and Exchange Act of 1934 also imposes on an entity's
management the obligation of establishing, implementing, and maintaining the system of
internal control over financial reporting, such that the company's books and records conform to
the selected basis of accounting.

42.     In 2002, Congress passed the Sarbanes-Oxley Act ("SOX"), which, among other
things, established provisions related to internal control over financial reporting. An overall
purpose of internal control over financial reporting is "to provide reasonable assurance
regarding the reliability of financial reporting and the preparation of financial statements for
external purposes in accordance with generally accepted accounting principles." (SOX). As part
of SOX, management of companies that are registered and make filings with the SEC is

required to make assertions regarding the design and effectiveness of the entity's system of internal controls over financial reporting.

43.     Item 404 of SOX, specifically, requires publicly-traded companies to, annually, provide a report on internal controls prepared by their management and attested to by their independent auditors. Additionally, SOX requires management to: (a) acknowledge its responsibility for the adequacy of the company's internal control structure and procedures for financial reporting; and (b) assess the effectiveness of this ICFR.

44.     The annual internal control report must contain:

- A statement of management's responsibility for establishing and maintaining adequate internal control over financial reporting for the company;

- Management's assessment of the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, including a statement as to whether the company's internal control over financial reporting is effective;

- A statement identifying the framework used by management to evaluate the effectiveness of the company's internal control over financial reporting; and

- A statement that the public accounting firm that audited the company's financial statements included in the annual report has issued an attestation report on management's assessment of the company's internal control over financial reporting.

(SOX, Item 307).

45.     A material weakness is defined as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis." (Auditing Standard No. 5, *An Audit Of Internal Control Over Financial Reporting That Is Integrated With An Audit Of Financial Statements*, A7).

46.     As detailed below, Ormat admitted in the 2017 10-K that it had a material

12

weakness arising out of a "deficiency in the design of our internal control over financial reporting related to our accounting for income taxes, which affected the recording of income tax accounts by us in our interim and annual consolidated financial statements during 2017, including audit adjustments to the income tax accounts."

## 2015: The Company's New Strategic Plan

*47.* In 2015, Ormat implemented a new multi-year strategic plan. As summarized in the 2017 10-K:

> Since 2015, we have implemented a number of elements of our new multi-year strategic plan which was reviewed by our Board of Directors (the "Board") in 2017. We expect the plan to evolve over time in response to market conditions and other factors. At this time, however, we expect that our primary focus will be as follows:
>
> - *Expand our geothermal geographical reach.* While we continue to evaluate opportunities worldwide, we currently see, Honduras, New Zealand, Philippines, Chile, Indonesia, Turkey, Kenya, Guatemala, China and Ethiopia as very attractive geothermal markets for us. We are actively looking at ways to expand our presence in those countries. In addition, we are ***looking to expand and accelerate growth through acquisitions and other investments, both domestically and globally***, such as our recent acquisition of a geothermal power plant in Guadeloupe in the Caribbean and our recent announcement of the execution of a definitive agreement to acquire U.S. Geothermal Inc., which has three operating power plants in the U.S.
>
> - *Expand into new technologies.* We ultimately hope to be able to leverage our technological capabilities over a variety of renewable energy platforms, including solar power generation and energy storage. Initially, however, we expect that our primary focus will be on expanding our core geothermal competencies to provide high efficiency solutions for high enthalpy applications by utilizing our binary enhanced cycle and technology, as well as expanding into steam geothermal generation equipment and facilities. We may acquire companies with technological and integration capabilities we

13

do not currently have, or develop new technology ourselves, where we can effectively leverage our expertise to implement this part of our strategic plan.

- *Expand our customer base*. We are evaluating a number of strategies for expanding our customer base to C&I customers. In the near term, however, we expect that a majority of our revenues will continue to be generated as they currently are, with our traditional electrical utility customer base for the Electricity segment and our on-going business development efforts for new customers for our Product segment.

While we believe that long-term growth can be realized through our transformational efforts over time, there is no assurance if and when we will meet our objective to become a leading global provider of renewable energy or that such efforts will result in long-term growth. We see these new initiatives as incremental measures to enhance shareholder value. While we implement the plan, we expect to continue, and expand, through organic growth, acquisitions, and other measures, our current business lines both in the Electricity and Product segments as well as other business lines as described above.

### *The Viridity Acquisition*

48.     One of Ormat's biggest steps in furtherance of its strategic plan was its acquisition of Viridity Energy, Inc. ("Viridity"). Ormat announced the acquisition on January 3, 2017 in a press release stating in relevant part:

**Ormat Enters the Growing Energy Storage and Demand Response Markets by Acquiring the Business of Viridity Energy**

Ormat Technologies, Inc. ("Ormat") (NYSE:ORA) today announced that it has entered into a definitive agreement to acquire substantially all of the business and assets of Viridity Energy, Inc. ("Viridity"), a privately held Philadelphia-based company with nearly a decade of expertise and leadership in demand response, energy management and storage. *The acquisition*, which is expected to close early 2017, *will mark Ormat's entry into the growing energy storage and demand response markets*, with an established North American presence.

Initial consideration for the acquisition is $35 million, which will be paid at closing and is subject to adjustment in certain cases. Additional

14

contingent consideration will be payable in two installments upon the achievement of certain performance milestones measured at the end of fiscal years 2017 and 2020. We expect Viridity to generate a positive operating income in 2017.

Using proprietary software and solutions, Viridity serves primarily retail energy providers, utilities, and large industrial and commercial clients. Viridity's offerings enable its clients to optimize and monetize their energy management, demand response and storage facilities potential by interacting on their behalf with regional transmission organizations and independent system operators. Founded in 2008, Viridity has under contract over 850 MW across 3,000 sites, including management of a portfolio of non-utility storage assets located in the northeastern US with over 80,000 operational market hours.

"This is an important strategic acquisition which combines Viridity's technology, its customer base, its highly experienced leadership team and employees that have in-depth knowledge and significant expertise in the demand response and energy storage and its presence in key North American markets together with Ormat's skills, resources, engineering strengths and access to capital," commented Isaac Angel, Ormat's CEO. "***Ormat intends to use the Viridity platform to accelerate long term growth, expand its market presence, and further develop Viridity's demand response VPower™ software platform and energy storage services***. Ormat will continue to provide services and products to existing customers, while expanding into new geographies and targeting a broader potential customer base. By leveraging the strength, stability, resources, EPC capabilities and global reach of Ormat, we expect to unlock significant new value for Ormat and its shareholders in the demand response and energy storage markets and generate incremental revenue and operating income."

Energy storage continues to be one of the fastest growing segments of the broader energy industry, set to reach an overall installed power capacity of 143.7 GW and a cumulative global market size of $162.3 billion in the next 10-year period, according to Navigant Research**.** This represents a CAGR of approximately 30% over the 10-year period in both in-front-of-the meter grid connected and behind-the-meter commercial and industrial deployments.

***"Ormat's long-term vision is to evolve from a recognized leader in the geothermal industry to a leader in the broader renewable energy market,"*** added Mr. Angel. "Establishing capabilities in the energy

storage markets is a key element in realizing Ormat's vision, as these capabilities will enable Ormat to provide a complete solution to customers. ***The acquisition will enable Ormat to become a significant player in the growing energy storage and demand response markets and to diversify its traditional customer base with new commercial and industrial (C&I) customers as well as utility customers, particularly in the energy storage markets.***"

"This acquisition is a clear win for the Viridity business and its existing customers," added Mack Treece, CEO of Viridity. "With Ormat's management depth, global reach, extensive relationships and financial resources, the Viridity business will be fully empowered to improve its products and services, and deliver increasing value to its customers."

49.     On the Company's March 1, 2017 conference call, Defendant Angel reiterated that "Viridity is an important strategic acquisition" and that the Company's "intend[s] to use the Viridity as a platform to accelerate long-term growth and to expand our market presence." On March 15, 2017, the Company announced the completion of its acquisition of Viridity.

50.     Ormat ultimately described the Viridity acquisition as follows in the 2018 10-K:

In March 2017, ***we entered the energy storage, demand response and energy management markets following the acquisition of*** substantially all of the business and assets of ***Viridity Energy, Inc.***, a Philadelphia-based company. ***The acquired business and assets comprise our Other segment.*** We are using our Viridity business to accelerate long-term growth, expand our market presence in a growing market and further develop our energy storage, demand response and energy management services, including the VPower™ software platform. We plan to continue providing services and products to existing Viridity customers, while expanding our service offerings to include development and EPC into new regions and targeting a broader potential customer base.

***ONGP Portfolio PPA Agreement***

51.     On June 1, 2017, the Company announced that it received final approval for the Power Purchase Agreement ("PPA") between its subsidiary, ONGP LLC, and the Southern California Public Power Authority ("SCPPA"). Under the PPA, SCPPA agreed to purchase

16

150MW of power generated by a portfolio of the Company's new and existing geothermal power plants. The SCPPA will resell the entire output to the Los Angeles Department of Water and Power ("LADWP").

52.     The portfolio PPA covers nine of Ormat's primary geothermal power plants, including new projects currently under construction or development, as well as existing geothermal power plants that will commence energy deliveries to SCPPA once their current PPAs terminate. The portfolio PPA also covers sixteen secondary facilities that could be used to replace or supplement the primary facilities.

53.     Like the Company's acquisition of Viridity, the ONGP PPA portfolio agreement was part of the Company's "long-term plans" to grow its domestic business.

54.     Commenting on the ONGP PPA, Defendant Angel highlighted the importance of the PPA portfolio agreement to the Company's growth within the United States, stating: "We are very excited to receive the final approval for this first portfolio PPA, which has a unique structure supporting Ormat's long-term plans to grow our geothermal business domestically. This PPA will enable both the development of multiple new projects as well as the sustainable operation of several of our existing geothermal power plants, thereby strengthening our ability to deliver long-term growth."

55.     Given the size of the portfolio PPA, the Company acknowledged in the 2017 2Q 10-Q that the SCPPA PPA "will require the Company to make significant capital expenditures in the U.S."

## The Class Period

56.     Before the ONGP PPA, the Company stated that it "believe[s] that based on [its] plans to increase [its] operations outside of the U.S., the cash generated from our operations outside of the U.S. will be reinvested outside of the U.S. In addition, [its] U.S. sources of cash and liquidity are sufficient to meet our needs in the U.S. and, accordingly, [the Company] d[id] not currently plan to repatriate the funds we have designated as being permanently invested outside the U.S." *See, e.g.*, 2016 3Q 10-Q, filed Nov. 8, 2016.

17

57.   For example, the Company stated as follows in its 2017 1Q 10Q:

The total amount of undistributed earnings of foreign subsidiaries for income tax purposes was approximately $367 million at December 31, 2016. It is the Company's intention to reinvest undistributed earnings of its foreign subsidiaries and thereby indefinitely postpone their remittance. Accordingly, no provision has been made for foreign withholding taxes or U.S. income taxes which may become payable if undistributed earnings of foreign subsidiaries were paid as dividends to the Company. The additional taxes on that portion of undistributed earnings which is available for dividends are not practicably determinable.

The Company believes that ***based on its plans to increase operations outside of the U.S., the cash generated from the Company's operations outside of the U.S. will be reinvested outside of the U.S. and, accordingly, we do not currently plan to repatriate the funds*** we have designated as being permanently invested outside of the U.S. If we change our plans, we may be required to accrue and pay U.S. taxes to repatriate these funds.

The Company is subject to income taxes in the U.S. (federal and state) and numerous foreign jurisdictions. Significant judgment is required in evaluating tax positions and determining the position for income taxes. Reserves are established to tax-related uncertainties based on estimates of whether, and the extent to which additional taxes will be due. As of March 31, 2017, ***the Company is unaware of any potentially significant uncertain tax positions for which a reserve has not been established.***

58.   By permanently reinvesting its foreign income the Company was able to avoid the statutory U.S. tax rate ranging from 35% to 21% on the unremitted foreign earnings in Ormat Systems. Instead, Ormat Systems was taxed at a reduced tax rate of 16% under Israel's Law for Encouragement of Capital Investments.

## The 2017 2Q 10-Q

59.   On August 8, 2017, the Company announced its financial results for the second quarter of 2017, issuing a press release and filing its 2017 2Q 10-Q.

18

60.      Ormat disclosed for the first time that, following its acquisition of Viridity and entering into the SCPPA portfolio PPA, it needed to alter its ongoing assertion regarding the reinvestment of foreign earnings. Specifically, the 2017 2Q 10-Q stated:

> **Assertion of permanent reinvestment of foreign unremitted earnings in a subsidiary**
>
> During the second quarter of 2017, in conjunction with the final approval of the SCPPA PPA which will require the Company to make significant capital expenditures in the U.S., the fact that the Company is currently looking for acquisitions in the U.S, and the acquisition of Viridity for a price of $35.3 million with two additional earn-out payments expected to be made in 2018 and 2021, ***the Company has re-evaluated its position with respect to a portion of the unrepatriated earnings of Ormat Systems*** ("OSL"), its fully owned Subsidiary in Israel, and after consideration of the aforementioned change in facts, ***determined that it can no longer maintain the permanent reinvestment position with respect to a portion of OSL unrepatriated earnings which will be repatriated*** to support the Company's capital expenditures in the U.S. Accordingly, and as further described in Note 11, ***the permanent reinvestment assertion of foreign unremitted earnings of OSL was reassessed and removed*** and the related deferred tax assets and liabilities as well as the estimated withholding taxes on expected remittance of OSL earnings to the U.S. were recorded by the Company in the second quarter of 2017 .

61.      It elaborated as follows:

> As further described in Note 1 and in connection with the closing of the SCPPA PPA portfolio agreement, ***during the second quarter of 2017 the Company changed its assertion related to permanent reinvestment of foreign unremitted earnings in Ormat Systems, its Israeli fully owned subsidiary.*** Accordingly, a deferred tax liability in the amount of $110.5 million was recorded which represents the estimated tax impact of future repatriation of the unremitted foreign earning in Ormat Systems at the statutory U.S. tax rate of 35%. Additionally, the Company accrued $53.9 million for the estimated Israeli withholding taxes expected when Ormat Systems remits its earnings to the U.S. ***The Company also recorded a deferred tax asset in the amount of $109.6 million for foreign tax credits related to taxes already paid by Ormat Systems on such earnings in Israel.***

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Realization of the deferred tax assets and tax credits is dependent on generating sufficient taxable income in appropriate jurisdictions prior to expiration of the NOL carryforwards and tax credits. In prior periods and through March 31, 2017 the Company had maintained a valuation allowance against its net deferred tax asset balance in the US. As of March 31, 2017 such valuation allowance was $109.6 million. ***Based upon new available evidence of the Company's ability to generate additional taxable income in the U.S. due to the closing of the SCPPA PPA portfolio and the Company's permanent reinvestment of unremitted earnings assertion change with respect to Ormat Systems Ltd., $62.0 million of valuation allowance was released against the U.S. deferred tax assets, as it is more likely than not that the deferred tax assets will be utilized.*** However, the Company is maintaining a valuation allowance of $40.8 million against a portion of the U.S. foreign tax credits that are expected to expire before they can be utilized in future periods. Additionally, the Company recorded a specific valuation allowance of $7 million attributable to current year projected activity as this will need to be held back and recognized throughout the year as current year income is earned for ***a total valuation allowance of $48 million as of June 30, 2017***.

* * *

The total amount of undistributed earnings of foreign subsidiaries related to Ormat Systems for income tax purposes was approximately $367 million at December 31, 2016. Although the Company plans to repatriate undistributed earnings related to Ormat Systems to support expected capital expenditure requirements in the U.S., ***based upon its plans to increase its operations outside of the U.S., it is the Company's intention to reinvest undistributed earnings of its other foreign subsidiaries and thereby indefinitely postpone their remittance***, given that the Company's requires existing and future cash to fund the anticipated investment and development activities as well as debt service requirements in those jurisdictions. In addition, the Company believes that ***existing and anticipated cash flows as well as borrowing capacity in the U.S. and cash to be remitted to the U.S. from Ormat Systems will be sufficient to meet its needs in the U.S.*** Accordingly, no provision has been made for foreign withholding taxes or U.S. income taxes with respect to its foreign subsidiaries, other than Ormat Systems, which may become payable if undistributed earnings of foreign subsidiaries were paid as dividends to the

20

Company. The additional taxes on that portion of undistributed earnings in those other jurisdictions which is available for dividends are not practicably determinable. If plans change the Company may be required to accrue and pay U.S. taxes to repatriate these funds.

62.    This statement was false and misleading because, as the Company later admitted, it included "errors in the income tax provision primarily relating to the Company's valuation allowance based on the Company's ability to utilize Federal tax credits in the U.S. prior to their expiration" as well as improper netting of federal income tax obligations against foreign tax obligations.

63.    In fact, according to CW1[3], as early as 2010 or 2011, the Company's financial models consistently showed that Ormat would not be able to use its federal tax credits before they expired, because the Company would not generate enough taxable income. The models considered several different types of tax credits, including foreign tax credits, renewable energy tax credits and investment tax credits. Moreover, the Company's financial models had to project out at least 20 years, because certain of these tax credits had 20-year expiration windows. Nevertheless, "the whole reason for the restatement" was that Ormat ultimately improperly recorded deferred tax assets that the Company's financial models had consistently shown it would not be able to use.

64.    This statement was additionally false and misleading because it explicitly described the release of $62 million of valuation allowance as "[b]ased upon *new available evidence of the Company's ability to generate additional taxable income in the U.S.* due to the closing of the SCPPA PPA portfolio and the Company's permanent reinvestment of unremitted earnings assertion change with respect to Ormat Systems Ltd."[4] However, as the Company later

---

[3] CW1 worked at Ormat from November 2004 to October 2015 in various high-ranking Finance positions. CW1 reported to CFO Joseph Tenne until April 2013, when CFO Doron Blachar took his place. CW1 then reported to CFO Doron Blachar.

[4] Moreover, under GAAP, the release of a valuation allowance itself *necessarily* indicates an expected increase in taxable income. This is because, in order to reduce a valuation allowance and utilize the associated tax benefits, an entity must be able to assert that it is more likely than

admitted in connection with the restatement, Defendants did not have any reasonable basis to conclude that it was more likely than not that the Company would generate enough taxable income to support the release of $62 million of valuation allowance.

65.     The 2017 2Q 10-Q also contained certifications under the Sarbanes-Oxley Act of 2004 ("SOX", and "SOX Certifications") signed by Defendants Angel and Blachar, providing in relevant part:

> 1. I have reviewed this quarterly report on Form 10-Q of Ormat Technologies, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are ***responsible for establishing and maintaining disclosure controls and procedures*** (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

---

not the entity will have sufficient future taxable income against which the entity will be able to apply said deferred tax asset(s) or credit(s), before such benefit expires.

Defendants had also previously told investors that the release of a valuation allowance itself inherently indicated an expected increase in taxable income. For example, the 2016 10-K stated that "where the projected operating results indicate that realization of our net deferred tax assets is not more likely than not, a valuation allowance is recorded" and that "[i]n the future, if there is sufficient evidence that we will be able to generate sufficient future taxable income in the U.S., we may be required to reduce this valuation allowance."

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

66.     The SOX certifications were false and misleading because the Company in fact did have significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, and the corresponding financial statements did not, in fact,

comply with GAAP—both of which the Company admitted in connection with its eventual restatement of its financial statements as reflected primarily in its 2017 10-K/A filed on June 19, 2018.

### The 2017 3Q 10-Q

67. On November 8, 2017, the Company filed its 2017 3Q 10-Q. The 2017 3Q 10-Q stated:

> As further described in Note 1 and in connection with the closing of the SCPPA PPA portfolio agreement, during the second quarter of 2017 the Company changed its assertion related to permanent reinvestment of foreign unremitted earnings in Ormat Systems, its Israeli fully owned subsidiary. Accordingly, a deferred tax liability in the amount of $111.0 million was recorded which represents the estimated tax impact of future repatriation of the unremitted foreign earning in Ormat Systems at the statutory U.S. tax rate of 35%. Additionally, the Company accrued $53.9 million for the estimated Israeli withholding taxes expected when Ormat Systems remits its earnings to the U.S. ***The Company also recorded a deferred tax asset in the amount of $111.1 million for foreign tax credits related to taxes already paid by Ormat Systems on such earnings in Israel.***
>
> Realization of the deferred tax assets and tax credits is dependent on generating sufficient taxable income in appropriate jurisdictions prior to expiration of the NOL carryforwards and tax credits. In prior periods and through March 31, 2017 the Company had maintained a valuation allowance against its net deferred tax asset balance in the US. As of March 31, 2017 such valuation allowance was $109.6 million. ***Based upon new available evidence of the Company's ability to generate additional taxable income in the U.S. due to the closing of the SCPPA PPA portfolio and the Company's permanent reinvestment of unremitted earnings assertion change with respect to Ormat Systems Ltd., $61.5 million of valuation allowance was released against the U.S. deferred tax assets, as it is more likely than not that the deferred tax assets will be utilized***. However, the Company is maintaining a valuation allowance of $47.0 million against a portion of the U.S. foreign tax credits that are expected to expire before they can be utilized in future periods….

* * *

The total amount of undistributed earnings of foreign subsidiaries related to Ormat Systems for income tax purposes was approximately $367 million at December 31, 2016. Although the Company plans to repatriate undistributed earnings related to Ormat Systems to support expected capital expenditure requirements in the U.S., based upon its plans to increase its operations outside of the U.S., it is the Company's intention to reinvest undistributed earnings of its other foreign subsidiaries and thereby indefinitely postpone their remittance, given that the Company requires existing and future cash to fund the anticipated investment and development activities as well as debt service requirements in those jurisdictions. In addition, the Company believes that existing and anticipated cash flows as well as borrowing capacity in the U.S. and cash to be remitted to the U.S. from Ormat Systems will be sufficient to meet its needs in the U.S. Accordingly, **no provision has been made for foreign withholding taxes or U.S. income taxes with respect to its foreign subsidiaries, other than Ormat Systems**, which may become payable if undistributed earnings of foreign subsidiaries were paid as dividends to the Company. The additional taxes on that portion of undistributed earnings in those other jurisdictions which is available for dividends are not practicably determinable. If plans change the Company may be required to accrue and pay U.S. taxes to repatriate these funds.

The Company is subject to income taxes in the U.S. (federal and state) and numerous foreign jurisdictions. Significant judgment is required in evaluating tax positions and determining the position for income taxes. Reserves are established to tax-related uncertainties based on estimates of whether, and the extent to which additional taxes will be due. **As of September 30, 2017, the Company is unaware of any potentially significant uncertain tax positions for which a reserve has not been established.**

68.     This statement was false and misleading because the Company had improperly released a material portion of its valuation allowance against the foregoing domestic federal deferred tax assets without sufficient basis to demonstrate that they could be used before they expired, which eventually forced the Company to restate its financial statements.

69.     The 2017 3Q 10-Q also contained SOX certifications signed by Defendants Angel and Blachar, providing in relevant part:

25

1. I have reviewed this quarterly report on Form 10-Q of Ormat Technologies, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are ***responsible for establishing and maintaining disclosure controls and procedures*** (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's

26

fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

70.    The SOX certifications were false and misleading because the Company in fact did have significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, and the corresponding financial statements did not, in fact, comply with GAAP—both of which the Company admitted in connection with its eventual restatement of its financial statements as reflected primarily in its 2017 10-K/A filed on June 19, 2018.

## **The Truth Begins to Emerge**

### **The 2017 10-K**

71.    On March 15, 2018, the Company filed its 2017 10-K.

72.    Among other things, the 2017 10-K stated that the Company had a material weakness in its internal controls over financial reporting, stating as follows:

*We have identified a material weakness in our internal control over financial reporting which, if not timely remediated, may adversely affect the accuracy and reliability of our financial statements, and*

27

*our reputation, business and the price of our common stock, as well as lead to a loss of investor confidence in us.*

In connection with the change in our repatriation strategy and the related release of the US income tax valuation allowance in the second quarter of 2017, *we did not perform an effective risk assessment related to our internal controls over the accounting for income taxes*. As a result, we *identified a deficiency in the design of our internal control over financial reporting related to our accounting for income taxes, which affected the recording of income tax accounts by us in our interim and annual consolidated financial statements during 2017*, including audit adjustments to the income tax accounts. As described under "Item 9A. Controls and Procedures" below, our management has concluded that this deficiency constitutes a *material weakness in our internal control over financial reporting* and, accordingly, internal control over financial reporting was not effective as of December 31, 2017.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

73.    However, the 2017 10-K also tried to reassure investors by misleadingly downplaying the severity and significance of this material weakness. It stated as follows in note 9A:

*Material weakness*. In connection with the change in our repatriation strategy and the related release of the US income tax valuation allowance in the second quarter of 2017, we did not perform an effective risk assessment related to our internal controls over the accounting for income taxes. As a result, we identified a deficiency in the design of our internal control over financial reporting related to our accounting for income taxes, which affected the recording of income tax accounts by us in our interim and annual consolidated financial statements during 2017, including audit adjustments to the income tax accounts. *This deficiency* resulted in immaterial adjustments to income tax expense and deferred tax liabilities, *but did not result in a material misstatement in our previously issued interim or annual consolidated financial statements nor does it require a restatement of or change in our consolidated financial statements for any prior*

28

*interim or annual period*. However, this control deficiency could result in a misstatement of the aforementioned balances and disclosures that would result in a material misstatement to the interim or annual consolidated financial statements that would not be prevented or detected. Our management has concluded that this deficiency constitutes a material weakness in our internal control over financial reporting.

74.    Similarly, the 2017 10-K included the following statement from the Company's auditors:

> *In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America*. Also in our opinion, the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control - Integrated Framework (2013) issued by the COSO because a material weakness in internal control over financial reporting existed as of that date related to ineffective risk assessment over accounting for income taxes.

> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The material weakness referred to above is described in Management's Report on Internal Control over Financial Reporting appearing in Item 9A. We considered this material weakness in determining the nature, timing, and extent of audit tests applied in our audit of the 2017 consolidated financial statements, and *our opinion regarding the effectiveness of the Company's internal control over financial reporting does not affect our opinion on those consolidated financial statements*.

75.    The 2017 10-K also tried to assure investors that the Company was already well on its way towards fixing the material weakness:

**Remediation Plan**

In response to the identified material weakness, our management, with the oversight of the Audit Committee of the Board of Directors, will update its risk assessment process related to income taxes and intends to implement additional control procedures. While certain remedial actions have been completed in the first quarter of 2018 and management has dedicated significant resources and efforts to implement a remediation plan, we continue to actively plan to implement additional control procedures. The remediation efforts, outlined below, are intended both to address the identified material weakness and to enhance our overall financial control environment. However, our management may amend this plan to include additional remedial action in light of its continuing evaluation of the identified deficiency in internal control over financial reporting.

We have:

- implemented specific enhanced controls procedures for the review, analysis and reporting of our income tax accounts, including control procedures of projections that support the deferred tax assets and liabilities;

- engaged an external tax and accounting firm to prepare and review our annual and quarterly income tax provision including to review and recommend additional control enhancements;

- recruited additional tax personnel; and

- enhanced our income tax controls with improved documentation.

We intend to:

- evaluate the need to recruit additional tax or accounting personnel during 2018; and

- continue to strengthen our income tax controls with improved documentation, communication and oversight.

We have commenced our remediation plan, with the goal of remediating this material weakness as soon as possible, subject to the conclusion by our management that our enhanced internal control over financial reporting is operating effectively following appropriate testing.

**The Restatement**

76.     On May 11, 2018, Ormat disclosed that it had to delay filing its Quarterly Report for the first quarter of 2018 because,

> [M]anagement has identified an error in the Company's financial statement presentation of deferred income tax assets and deferred income tax liabilities that affects the Company's balance sheets in previous reporting periods. Specifically, the Company netted certain deferred income tax assets and deferred income tax liabilities across different tax jurisdictions that are not permitted to be netted pursuant to United States generally accepted accounting principles. The Company is evaluating the impact of this error on its consolidated financial statements and the extent to which the Company's annual and quarterly consolidated financial statements filed in previous periods require revision or amendment. Further, the Company is in the process of evaluating the control implications of this error as it relates to the material weakness disclosures previously made in the Annual Report on Form 10-K for the year ended December 31, 2017.

77.     On this news, Ormat's stock fell $3.58 per share, or over 6%, over two consecutive trading days to close at $52.77 per share on May 14, 2018.

78.     On May 16, 2018, the Company announced that the internal control problems were actually so serious that the Company was forced to "restate its second, third and fourth quarter 2017 financial statements and its full-year 2017 financial statements" after all. The Company's press release stated, in relevant part:

> As a result of the restatement, ***investors should no longer rely upon the Company's previously issued financial statements for the periods set forth above, earnings releases for these periods, and other communications relating to these financial statements***. In addition, the Company is further delaying the filing of the quarterly report on Form 10-Q for its first quarter of 2018 with the Securities and Exchange Commission.

> The decision to restate these financial statements is based on the Company's conclusion that there were ***errors in the income tax provision primarily relating to the Company's valuation allowance based on the Company's ability to utilize foreign tax credits in the U.S. prior to their expiration. Additionally, the Company netted certain deferred income tax assets and deferred income tax liabilities across different tax jurisdictions that are not permitted to be netted***

31

> *pursuant to United States generally accepted accounting princip*les.
> The restatement is expected to *impact the "income tax (provision)*
> *benefit" line item in the Company's statements of operations, with*
> *associated impacts to net income and earnings per share* and the
> "deferred income taxes" line items on its balance sheet. In connection
> with the restatement of the full-year 2017 financial statements, the
> Company will also make revisions to the same line items in certain
> quarterly financial statements for 2016 and its full-year 2016 and 2015
> financial statements.

79.     On this news, Ormat's stock fell $0.67 per share from its previous closing price

to close at $52.35 per share on May 16, 2018.

80.     On June 19, 2018, the Company restated its financial statements by filing

amended versions of the 2017 2Q 10-Q (the "2017 2Q 10-Q/A"), the 2017 3Q 10-Q (the "2017

3Q 10-Q/A"), and the 2017 10-K (the "2017 10-K/A").

81.     The 2017 10-K/A summarized the restatement as follows:

> **Restatement of previously issued consolidated financial statements**
>
> As described further in Note 18, in the second quarter of 2017, the
> Company partially released its valuation allowance against its U.S.
> deferred tax assets. During the first quarter of 2018, the Company
> concluded that there were *material tax provision and related balance*
> *sheet errors in its previously issued 2017 financial statements,*
> *primarily relating to the Company's ability to utilize Federal tax*
> *credits in the U.S. prior to their expiration starting in 2027 and the*
> *resulting impact on the Company's deferred tax asset valuation*
> *allowance, and the inappropriate netting of certain deferred income*
> *tax assets and deferred income tax liabilities across different tax*
> *jurisdictions that was not permissible under U.S. generally accepted*
> *accounting principles*. In addition, there were other immaterial prior
> period errors, including an out-of-period adjustment that had been
> previously recorded for the correction of an understated liability for
> unrecognized tax benefits related to intercompany interest.
>
> The error in the deferred tax asset valuation allowance *resulted in an*
> *understatement of the income tax provision and net income in the*
> *previously reported 2017 consolidated statement of operations and*
> *comprehensive income of $23.1 million* (see also Note 23 for the
> impact of such error on the 2017 unaudited quarterly financial

statements).  The impact of the errors on the previously reported December 31, 2017 consolidated balance sheet was an ***understatement of deferred tax liabilities and deferred tax assets of $62.0 million***, for the error in netting certain deferred income tax assets and liabilities across different tax jurisdictions, offset by an ***overstatement in deferred tax assets of $24.8 million, primarily related to the valuation allowance errors described above***, resulting in a net understatement in deferred tax assets of $37.2 million. In addition, ***previously reported December 31, 2017 retained earnings was overstated by $24.4 million*** and accumulated other comprehensive loss was understated by $0.4 million, ***representing the impact of all tax and tax-related errors dating back to 2013.***

As a result of such errors, the Company concluded that the previously issued 2017 consolidated financial statements were materially misstated and has restated these financial statements.

**Revision of previously issued consolidated financial statements**

The Company had previously identified certain other tax errors, including a prior period error related to the translation of deferred tax liabilities in the Company's Kenyan subsidiary, which were previously determined to be immaterial. Accordingly, those amounts are also being corrected and reflected in the appropriate periods.

The Company assessed the materiality of these tax and tax related errors impacting 2015 and  2016 in accordance with the SEC's Staff Accounting Bulletin ("SAB") Topic 1.M, Materiality, codified in ASC Topic 250, Presentation of Financial Statements ("ASC 250"), and concluded that the previously issued 2016 and 2015 consolidated financial statements were not materially misstated; however, in order to correctly reflect the adjustments as described above in the appropriate period, management has elected to revise the affected previously issued financial statements in this Form 10-K/A filing. As a result, the revised 2015 consolidated financial statements reflect a $0.8 million increase in the tax benefit, net income and comprehensive income and the revised 2016 consolidated financial statements reflect a $5.2 million increase in the tax provision and a corresponding reduction in net income and comprehensive income.  Certain of these errors originated in years prior to 2015, and accordingly retained earnings as of January 1, 2015 has been increased by $3.1 million to correct for those errors originating prior to 2015.

82.     The 2017 2Q 10-Q/A noted that "the error in the deferred tax asset valuation allowance resulted in an understatement of the income tax provision and an ***overstatement of net income of $26.4 million and $26.5 million*** for the three and six months ended June 30, 2017, respectively." Likewise, the 2017 3Q 10-Q/A noted that "the error in the deferred tax asset valuation allowance resulted in an overstatement of the income tax provision and an ***understatement of net income of $4.8 million*** for the three months ended September 30, 2017 and an understatement of the income tax provision and an overstatement of net income of $21.7 million for the nine months ended September 30, 2017."

83.     The 2017 2Q 10-Q/A reflected corrections to the amount of the allowance against the US deferred tax assets improperly released by the Company in the second quarter of 2017. It stated the following in that regard (differences in bold italics):

> As further described in Note 1, the Company has restated, for 2017, and revised, for 2016, its previously issued unaudited condensed consolidated financial statements for the three and six months ended June 30, 2017 and 2016. Also as further described in Note 1 and in connection with the closing of the SCPPA PPA portfolio agreement, during the second quarter of 2017, the Company changed its assertion related to permanent reinvestment of foreign unremitted earnings in Ormat Systems, its Israeli fully owned subsidiary. Accordingly, a deferred tax liability in the amount of $110.5 million was recorded which represents the estimated tax impact of future repatriation of the unremitted foreign earning in Ormat Systems at the statutory U.S. tax rate of 35%. Additionally, the Company accrued $53.9 million for the estimated Israeli withholding taxes expected when Ormat Systems remits its earnings to the U.S. The Company also recorded a deferred tax asset in the amount of $109.6 million for foreign tax credits related to taxes already paid by Ormat Systems on such earnings in Israel.

> Realization of the deferred tax assets and tax credits is dependent on generating sufficient taxable income in appropriate jurisdictions prior to expiration of the NOL carryforwards and tax credits. In prior periods and through March 31, 2017, the Company had maintained a valuation allowance against its net deferred tax asset balance in the U.S. As of March 31, 2017, such valuation allowance was ***$116.2 million***. Based upon new available evidence of the Company's ability to generate additional taxable income in the U.S. due to the closing of

the SCPPA PPA portfolio and the Company's permanent reinvestment of unremitted earnings assertion change with respect to Ormat Systems Ltd., *$35.6 million* of valuation allowance was released against the U.S. deferred tax assets, as it is more likely than not that the deferred tax assets will be utilized. However, the Company is maintaining a valuation allowance of *$74.6 million* against a portion of the U.S. foreign tax credits and state net operating loss that are expected to expire before they can be utilized in future periods. Additionally, the Company recorded a specific valuation allowance of $6.0 million attributable to current year projected activity as this will need to be held back and recognized throughout the year as current year income is earned for a total valuation allowance of *$80.6 million* as of June 30, 2017. This valuation allowance is based upon management's estimates of future taxable income.

84.   Ormat acknowledged in these restated filings, consistent with the accounting rules, that "realization of the deferred tax assets and tax credits is dependent on generating sufficient taxable income in appropriate jurisdictions prior to expiration of the NOL carryforwards and tax credits." The foregoing demonstrates that, in view of a change in its "permanent reinvestment of unremitted earnings assertion", and despite the fact that the Company had concluded it was "more likely than not" (a pertinent threshold measurement under GAAP for determining the carrying value of deferred tax assets and tax credits) that its U.S. deferred tax assets could not be utilized, the Company had released too much of the established valuation allowance against such assets. Indeed, according to CW1, Ormat knew as far back as *2011* that financial models showed that it was more likely than not that Ormat would ***not*** be able to use the accumulated tax credits before they expired. The 2017 10-K/A, therefore, reflects a smaller release ($35.6 million) than what was initially recorded by the Company ($62 million), based on what portion of those deferred tax assets the Company would more likely than not able to utilize before they expired.

85.   The filings also indicate that, after the release of the valuation allowance, the Company did not have a sufficient reserve against its U.S. foreign tax credits (and that certain deferred tax assets that had emanated in the United States could not be used to offset obligations for foreign taxes) given that it would not be able to utilize certain Federal tax credits before they

1    expired.

2         86.     The disclosures made throughout the relevant timeframe strongly suggest that the

3    two items comprising the restatement were directly related to one another—i.e. the release of

4    the reserve may have been effectuated to offset the tax impact associated with the repatriation of

5    earnings generated by Ormat Systems in Israel—especially since Ormat's original 2017 2Q 10-

6    Q and 2017 3Q 10-Q specifically referenced the SCPPA as the purported impetus for both the

7    release of the valuation allowance and the change in the reinvestment assertion for the

8    operations of its foreign subsidiary Ormat Systems, Ltd. The Company could no longer assert

9    that it would indefinitely reinvest the earnings of Ormat Systems Ltd., which triggered the

10   requirement for repatriation. In turn, such repatriation of those earnings brought with it unique

11   and additional U.S. Federal tax obligations. Those additional tax obligations appear to have

12   precipitated the improper treatment and usage of the Company's deferred tax assets—including

13   the release of valuation allowances relating thereto. All of the foregoing occurred on the heels of

14   the SCPPA and despite the statements of CW1 who stated that the Company was well aware

15   that it would not be able to use these deferred tax assets before they expired.

16        87.     The Company's decision to net deferred tax assets across different jurisdictions

17   presumably emanated from these newfound tax obligations—and the Company's awareness of

18   previously-accumulated deferred tax assets in the U.S. GAAP explicitly provides, however, that

19   ***such deferred tax assets must be measured uniquely for each jurisdiction***, stating: "[d]eferred

20   taxes shall be determined separately for each tax-paying component (an individual entity or

21   group of entities that is consolidated for tax purposes) in each tax jurisdiction." (ASC 740-10-

22   30-5). As such, the Company's decision to net deferred tax assets across tax jurisdictions was

23   improper, and subject to restatement in the 2017 2Q 10-Q/A, 2017 3Q 10-Q/A, and 2017 10-

24   K/A.

25        88.     The 2017 Form 10-K/A also stated the following with respect to the identified

26   material weakness in internal control over financial reporting:

27            ***We have identified a material weakness in our internal control over***
             ***financial reporting which, if not timely remediated, may adversely***

28

36

*affect the accuracy and reliability of our financial statements, and our reputation, business and the price of our common stock, as well as lead to a loss of investor confidence in us.*

In connection with the change in our repatriation strategy and the related release of the US income tax valuation allowance in the second quarter of 2017, we did not perform an effective risk assessment related to our internal controls over the accounting for income taxes. As a result, we identified a deficiency in the design of our internal control over financial reporting related to our accounting for income taxes, which affected the recording of income tax accounts by us in our interim and annual consolidated financial statements during 2017, including audit adjustments to the income tax accounts. As described under "Item 9A. Controls and Procedures" below, our management has concluded that this deficiency constitutes a material weakness in our internal control over financial reporting and, accordingly, internal control over financial reporting and our disclosure controls and procedures were not effective as of December 31, 2017.

89.     It also stated:

*Restatement of Previously Issued Financial Statements*

Management and we previously concluded that the Company did not maintain an effective internal control over financial reporting as of December 31, 2017 because of the material weakness related to ineffective risk assessment over accounting for income taxes. ***Management has determined that the restatement described in Note 1 to the consolidated financial statements was an additional effect of the material weakness described above***. Accordingly, this restatement did not affect management's report or our opinion on internal control over financial reporting.

90.     It further detailed as follows:

*Evaluation of effectiveness of internal control over financial reporting.* Our management, under the supervision and participation of our Chief Executive Officer and our Chief Financial Officer, has conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2017 using criteria established in *Internal Control — Integrated Framework (2013)* issued by the COSO and, based on this evaluation, **concluded that our internal control over financial reporting was not effective as of December 31, 2017**

37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**as a result of the material weakness in our internal control over financial reporting discussed below**. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

*Material weakness*. In ***connection with the change in our repatriation strategy and the related release of the US income tax valuation allowance in the second quarter of 2017, we did not perform an effective risk assessment related to our internal controls over the accounting for income taxes. As a result, we identified a deficiency in the design of our internal control over financial reporting related to our accounting for income taxes, which affected the recording of income tax accounts by us in our interim and annual consolidated financial statements during 2017, including audit adjustments to the income tax accounts.*** This control deficiency could result in a misstatement of the aforementioned balances and disclosures that would result in a material misstatement to the interim or annual consolidated financial statements that would not be prevented or detected. Our management has concluded that this deficiency constitutes a material weakness in our internal control over financial reporting.

In Management's Report on Internal Control Over Financial Reporting included in our original Annual Report on Form 10-K for the year ended December 31, 2017, our management concluded that we did not maintain effective internal control over financial reporting as of December 31, 2017 because of the material weakness described above. As a result we concluded that we did not maintain an effective internal control over financial reporting as of December 31, 2017, based on the criteria in *Internal Control-Integrated Framework* (2013) issued by the COSO. Management has determined that ***the restatement described in Note 1 to the consolidated financial statements was an additional effect of the material weakness described above***. Accordingly, this restatement did not affect our assessment of internal control over financial reporting.

91.     All of these disclosures, made after the errors in the Company's financial statements had been identified and presumably corrected in connection with its amended filings on Forms 10-K/A and 10-Q/A, represent acknowledgments by the Company that, at the time of

38

its original filings, it had not maintained adequate internal controls over financial reporting – which either caused or contributed to the material misstatements of the Company's financial statements for the second, third, and fourth quarters of 2017, including the year-end financial statements included within Form 10-K.

92.     Indeed, management is not permitted to conclude that the company's internal control over financial reporting is effective if any material weaknesses are identified, and management must disclose any such material weaknesses. To the contrary, a material weakness indicates that the system of internal control is not operating effectively to ensure there are not material errors in the relevant financial statements—further calling into question the conclusions expressed by the Company in its original 2017 10-K.

93.     Further, the disclosures made by the Company with respect to the identified material weakness in internal controls confirm that such material weakness emanated directly and specifically from the Company's modification of its "repatriation strategy" which, according to the excerpted disclosures, led to the "related release of the US income tax valuation allowance in the second quarter of 2017."

94.     And despite the Company's initial attempts to downplay the significance of the identified material weakness, and to assure investors that the Company was well on its way towards implementing its remediation plan—the *same material weakness still existed a whole year later*. As stated in the 2018 10-K:

> *Material weakness.* In connection with the change in our repatriation strategy and the related release of the US income tax valuation allowance in the second quarter of 2017, we did not perform an effective risk assessment related to our internal controls over the accounting for income taxes. As a result, we identified a deficiency in the design of our internal control over financial reporting related to our accounting for income taxes, which resulted in the restatements of the Company's unaudited condensed consolidated financial statements for the three and six months ended June 30, 2017, the three and nine months ended September 30, 2017, and the restatement of the Company's consolidated financial statements for the year ended December 31, 2017. Our management has concluded that this

deficiency constitutes a material weakness in our internal control over financial reporting.

In Management's Report on Internal Control Over Financial Reporting included in our original Annual Report on Form 10-K for the year ended December 31, 2017, our management concluded that we did not maintain effective internal control over financial reporting as of December 31, 2017 because of the material weakness described above. As a result, we concluded that we did not maintain an effective internal control over financial reporting as of December 31, 2017, based on the criteria in Internal Control-Integrated Framework (2013) issued by the COSO.

**Remediation Plan**

Subsequent to the evaluation made in connection with filing our Amended Annual Report on Form 10-K for the year ended December 31, 2017, our management, with the oversight of the Audit Committee of the Board of Directors, has continued the process of remediating the material weakness. In connection with the remediation process, we have:

- performed an enhanced risk assessment related to our internal controls over the accounting for income taxes;

- recruited additional tax personnel throughout the year, including a VP of Tax in January 2019;

- engaged an external tax and accounting firm to prepare and review our annual and quarterly income tax provision;

- implemented specific control procedures for the review, analysis and reporting of our income tax accounts, including control procedures of projections that support the deferred tax assets and liabilities;

- strengthened our income tax controls with improved documentation, communication and oversight.

We have made substantial progress in accordance with our remediation plan. However, the material weakness will not be considered remediated until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. As such, since an appropriate period of time has not yet passed, we have determined that we did not maintain an effective internal control over financial

reporting as of December 31, 2018 and have a material weakness in internal control over financial reporting in accounting for income taxes.

95.     Subsequently, in the second quarter of 2018, Ormat recorded a noncash tax expense of $16.9 million, which "represents a partial reverse, as expected, of the tax benefit of $44.4 million that was recorded in the first quarter of 2018 for the reduction of the valuation allowance related to foreign tax credit and production tax."

## Loss Causation

96.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities, and operated as a fraud or deceit on Class-Period purchasers of such securities.

97.     As the truth relating to Defendants' prior false statements, misrepresentations, and fraudulent conduct was disclosed to the market, the price of Company securities fell, as the prior artificial inflation came out of their respective prices. As a result of their purchases of the Company's securities during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## Class Action Allegations

98.     Lead Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of all those who purchased or otherwise acquired the Company's securities during the Class Period. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

99.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on

41

NYSE and TASE. While the exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

100.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

101.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

102.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   Whether Defendants violated the Exchange Act;

b.   Whether Defendants participated in and pursued the wrongful activities complained of herein;

c.   Whether Defendants' statements were materially false and misleading or omitted to state material facts about the Company;

d.   Whether Defendants acted with due care in misrepresenting or omitting to state material information concerning the Company; and

e.   The extent of damages sustained by members of the Class and the appropriate measure of damages.

103.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

104.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

105.    The questions of law or fact common to the Class predominate over any questions affecting individual members of the Class, such that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. There will be no difficulty in managing this action as a class action.

# <u>Count I</u>

## <u>Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5</u><br><u>Against All Defendants</u>

106.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

107.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire the Company's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

108.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for the Company's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

109.   By virtue of their positions at the Company, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

110.   Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of the Company's internal affairs.

111.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of the Company's securities was artificially inflated

throughout the Class Period. In ignorance of the adverse facts concerning the Company's business and financial condition which were concealed by defendants, Lead Plaintiffs and the other members of the Class purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

112. During the Class Period, the Company's securities were traded on an active and efficient market. Lead Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of the Company's securities at prices artificially inflated by defendants' wrongful conduct. Had Lead Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiffs and the Class, the true value of the Company's securities was substantially lower than the prices paid by Lead Plaintiffs and the other members of the Class. The market price of the Company's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiffs and Class members.

113. By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

114. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

# Count II

## Violations of Section 20(a) of the Exchange Act
## Against the Individual Defendants

115.    Lead Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

116.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false statements.

117.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company and to correct promptly any public statements issued by the Company which had become materially false or misleading.

118.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to and did control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

119.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which

comprise the primary violations about which Plaintiff and the other members of the Class complain.

120.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

# Count III

### Violations of the Israel Securities Law, 1968
### Against All Defendants for Purchases Made on the TASE

121.     Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

122.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire the Company's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

123.     Throughout the Class Period, the Company's common shares were dually listed on NYSE and TASE.

124.     Israeli securities law provides unique treatment for securities of certain firms that are "dual listed," *i.e.*, available for trading on both the TASE and the national U.S. stock markets.   The Company is thus deemed a "foreign corporation" according to § 1 of the Israeli

47

Securities Law, 1968 (the "Securities Law"), defined as "a corporation incorporated in Israel whose securities are listed for trade on a foreign stock exchange." In adopting this arrangement, Israel applies U.S. laws and regulations, including the anti-fraud provisions of the U.S. securities laws, for enforcement of disclosure obligations. (Securities Law §§ 35T, 35EE; *Verifone Holdings, Inc.* v. *Stern*, Class Action 3912-01-08, decision rendered Nov. 16, 2008; and *Stern* v. *Verifone Holdings, Inc.*, Class Action 3912-01-08, decision rendered Aug. 25, 2011, subsequent to and in light of *Morrison v. National Australia Bank*, 130 S. Ct. 2869 (2010)). According to Israeli case law, liability for violations thereof is pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act applies to the claims arising from trades made by the Israeli Investor Group on the TASE.

125. In violation of Section 20(a) of the Exchange Act, the Individual Defendants had control over the Company and made the material false and misleading statements and omissions alleged herein within the meaning of Section 20(a) of the Exchange Act, causing damages to Lead Plaintiff and the Class. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

126. Alternatively, if this Court concludes that Israeli, not U.S., law applies to the claims arising from the Israeli Investor Group's purchases of common shares on the TASE, the following provisions and causes of action apply to those claims:

    a. Regulations 3-5 of the Securities Regulations (Periodic and Immediate Reports of Foreign Corporation), 2000 promulgated under the Securities Law, 1968 (the "Securities Law"). The Company breached its reporting obligations under the "foreign law" (i.e. U.S. law) defined in § 1 of the Securities Law as "the law applying to a foreign corporation because its securities are listed for trade on a foreign stock exchange, including the rules of that foreign stock exchange." Specifically, the Company failed to submit and publicize reports, notices, and

other documents as required under U.S. law, in a timely fashion as required under U.S. law or earlier, on issues required under U.S. law.  The Company thereby caused damage to Lead Plaintiff and the Class.

b.  § 36 of the Securities Law and Regulations 30, 36 of the Securities Regulations (Periodic and Immediate Statements), 1970 thereunder. The Company failed to submit immediate reports in a timely fashion as required under Regulation 30. According to Regulation 36(a), "An [immediate] report shall provide, with respect to any event or matter that deviates from the corporation's ordinary course of business, the details of [such an event's or matter's] nature, scope or potential result which will have or could have a significant effect on the corporation; the same details will be provided with respect to any event or matter that could significantly affect the price of the corporation's securities." Moreover, even if the Company may have delayed timely reporting pursuant to Regulation 36(b), once it became aware of rumors and other public information, it breached its obligation under Regulation 36(d) to submit an immediate report and refer therein to the correctness of the information that has already been made public.  The Company thereby caused damage to Lead Plaintiff and the Class.

c.  §§ 31-32A, 34, 38B-38C of the Securities Law - Read together, these sections impose liability, *inter alia*, on a corporation, a director of a corporation, its general manager, and a controlling shareholder thereof with regard to a misleading item that was in a report, notice or document that the corporation filed pursuant to this Law - to anyone who sold or purchased securities in the course of trading on a stock exchange or over the counter, for damage caused to them by the inclusion of a misleading item in those disclosures.  A "misleading item" is defined in § 1 of the Securities Law as "including anything that is likely to mislead a reasonable investor, and any matter the omission of which is likely to mislead a reasonable investor."  Specifically, § 32A(c) denies the safe harbor protection for "forward looking information" under this Section from "a party

that knew that the forward-looking information would not be realized." Section 32A(d) further excludes from the safe harbor's purview "facts, figures or other details in a prospectus, opinion, report, review or certificate, as applicable, which served as a basis for forward-looking information." Defendants are liable to Lead Plaintiff and the Class under these provisions.

d.   § 52K of the Securities Law. This general civil liability provision imposes liability on an issuer, the directors of the issuer, its general manager, and on a controlling shareholder of the issuer for any damage caused to a holder of the issuer's securities by virtue of the issuer's violation of the provisions of this Law or of regulations hereunder. Defendants are liable to Lead Plaintiff under this provision.

e.   §§ 35-36 of the Torts Ordinance [New Version]. These sections impose general liability in torts for negligence towards any person where a reasonable person in like circumstances should have foreseen that in the ordinary course of things the former person may be harmed by the latter person's conduct or omission. Defendants are liable for damage caused to Lead Plaintiff and the Class by the former's misrepresentations as detailed in the above paragraphs.

f.   § 63 of the Torts Ordinance [New Version] - This section imposes general liability in torts for breach of statutory duty on any person who failed to comply with a duty imposed on him according to any statute, excepting this Ordinance, where the statute, according to its correct construction, is meant for the protection or benefit of another person, the breach caused damage to that person of the kind or nature of damage meant by the statute, unless that statute was meant to exclude such remedy. Defendants are liable for damage caused to Lead Plaintiff and the Class by the former's failures to comply with their duties under the Securities Law as detailed in the above paragraphs.

## **Prayer for Relief**

**WHEREFORE** Lead Plaintiff demands judgment against Defendants as follows:

A.  Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Lead Plaintiffs as Class representatives;

B.  Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.  Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.  Awarding such other and further relief as this Court may deem just and proper.

## **Jury Demand**

Plaintiffs demand trial by jury.

Respectfully submitted:

Dated: May 13, 2019

**MUEHLBAUER LAW OFFICE, LTD.**

*/s/ Andrew R. Muehlbauer*
ANDREW R. MUEHLBAUER, ESQ.
Nevada Bar No. 10161
7915 West Sahara Ave., Suite 104
Las Vegas, Nevada 89117
Telephone: 702-330-4505
Facsimile: 702-825-0141
andrew@mlolegal.com

**POMERANTZ LLP**
Jeremy A. Lieberman (admitted *pro hac vice*)
Murielle J. Steven Walsh (pending *pro hac vice*)
Aatif Iqbal (pending *pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile:  212-661-8665

jalieberman@pomlaw.com
mjsteven@pomlaw.com
aiqbal@pomlaw.com

*Attorneys for Lead Plaintiff Phoenix Insurance Company Ltd.*